IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 11, 2007

## STATE OF TENNESSEE v. WALTER MARTIN

**Appeal from the Criminal Court for Shelby County**
**No. 04-05112     James C. Beasley, Jr., Judge**

---

**No. W2006-01148-CCA-R3-CD  - Filed October 16, 2007**

---

The Defendant, Walter Martin, was convicted of rape, a Class B felony, and sentenced to ten years at 100% in the Department of Correction.  On direct appeal, he argues that the evidence was insufficient to establish Shelby County as the proper venue for his trial and that he was erroneously sentenced.  Following our review, we affirm the judgment of the trial court and the Defendant's sentence but remand for correction of two clerical errors made in the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed;**
**Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Marvin Ballin, Memphis, Tennessee, for the appellant, Walter Martin.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; and Nichole Germain, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual background

A grand jury indicted the Defendant for two counts of aggravated rape, alleging that the offenses were committed in Shelby County on June 15, 2004.  Subsequently, the Defendant was tried by a jury in Shelby County where the following evidence was presented.

The victim, Riitta-Maija Lehtinen, a United States citizen originally from Finland, testified that on June 14, 2004, she was in Lexington, Kentucky working as an airplane pilot for Shuttle America, which flies passenger aircraft for U.S. Airways Express.  As she prepared to pilot a flight from Lexington to Pittsburgh, she received a telephone call at approximately 7:30 p.m. from a "state

trooper in Kodiak, Alaska" who informed her that her boyfriend of seven years, also a pilot, had died in an airplane crash. After consulting her supervisor, she was released from her duties and allowed to leave.

Ms. Lehtinen wanted to go to her home in Memphis immediately, so she could then travel to Alaska where her boyfriend had died. Initially, she tried to find a flight, but none would get her home that night. Then, she tried to rent a car, but no car was available. She also decided against taking a bus because it would have been too slow. At that point, she decided to hitchhike to Memphis. She explained that she had hitchhiked once before in Finland but had not ever hitchhiked in the United States.

First, she briefly "caught [a] ride" with someone in a car who took her to the "Kentucky Parkway." Then, she was picked up by a truck driver who introduced himself as "Rattlesnake." Rattlesnake drove her to Union City, Tennessee. Before he dropped her off, Rattlesnake inquired over his commercial band radio whether another truck driver was going toward Memphis, and a truck driver who called himself "Indy" responded affirmatively. Ms. Lehtinen testified that this man, who was the Defendant, then picked her up and drove her from Union City to Memphis.

She said that after approximately two and a half or three hours, they had arrived in Memphis and were driving "down on Highway 51," when the Defendant said he needed to use the bathroom and pulled the eighteen-wheeler truck into a shopping center. Ms. Lehtinen expected him to get out of the truck and relieve himself, but he did not. Rather, according to Ms. Lehtinen, he put a knife to her throat and told her he wanted to have sex with her. She did not see the knife but felt it against her throat. She began to cry and asked him repeatedly "how he could do this to her" because he knew someone very dear to her had died.

Ms. Lehtinen testified that the Defendant physically lifted her into a bed in the back of the cab of the truck and again insisted that he wanted to have sex with her. She pleaded with him; he said he was going to hurt her; and he did "hurt [her] face." She was scared and "[f]elt really bad" and confused about what was happening. He lifted up her T-shirt and her bra and "started to suck and lick [her] breast." Then, he pulled down her pants and underwear and "started to lick [her] vagina."

Ms. Lehtinen stated that she did not attempt to fight. She "didn't see any point in fighting" because "he's a man. He—has more strength than I do and if I would start to fight maybe for sure he's going to kill me or I mean, I didn't see any point to it." She did not scream because she did not see anyone at the shopping center and did not "see any point in that either." Ms. Lehtinen testified that it was "around" 3:00 a.m. when these events were taking place and that they were in a shopping center near Highway 51 in Shelby County.

She testified that the Defendant "put his fingers into [her] vagina," and then he "penetrated with his penis." She stated that his penis was inside her vagina for "about three minutes" and that he ejaculated while his penis was inside her.

Afterward, the Defendant got back into the driver's seat and drove her to a place near the Memphis airport. Ms. Lehtinen testified that it took "probably 10, 15 minutes" to drive from the shopping center where the incident occurred to this location near the airport. She got out of the truck, and he "said he was sorry" and left. Ms. Lehtinen then called 9-1-1. Twenty minutes later, a police officer picked her up near the intersection of I-240 and Airways Boulevard.

The policeman drove her to the "Rape Crisis Center" in Memphis where she told a nurse what had happened to her. The nurse had her take off her clothes and conducted a thorough examination. The examination took about twenty minutes. Then, she was driven to her car, which was parked in the employee parking lot at the airport, and she went home.

Officer Thomas E. Woods of the Memphis Police Department testified that, after being dispatched at approximately 3:45 a.m., he retrieved Ms. Lehtinen from the shoulder of I-240 near Airways Boulevard. According to Officer Woods, she was "distressed" and told him that she had been hitchhiking and was raped by a truck driver in a shopping center off Highway 51 in Memphis. After consulting with his Lieutenant, Officer Woods took Ms. Lehtinen to the Memphis Rape Crisis Center.

Julie Atkeison, a nurse from the Memphis Sexual Assault Resource Center,[1] testified that she conducted "a full physical exam" of Ms. Lehtinen the morning after the incident. Atkeison stated that Ms. Lehtinen "was very upset" and that she "was just crying during the whole time that we were talking." Atkeison did not observe any bruising or any other injury after conducting a speculum exam. Asked whether the absence of injury was medically significant in a rape case, Atkeison explained that "[i]t can be. She is a . . . mature female. She can have babies. So her hymen stretches to allow passage of a baby. So not finding an injury is not significant in someone who is in the age range of 16 to 45 in those child bearing years." Atkeison also testified that it is "very common not to find injuries" in rape victims.

Atkeison swabbed her breasts and vaginal area for evidence and sent the swabs to the Tennessee Bureau of Investigation. The Defendant stipulated at trial that the bureau's DNA analysis revealed that his saliva was present on both her breasts and that his spermatozoa and saliva were present inside her vagina.

Ms. Lehtinen also testified that "[a] few days" after the medical examination, she described the man who raped her, as well as the numbers and markings on his truck, to Sergeant Daniel Parris of the Memphis Police Department. Subsequently, she viewed a "photo spread" and positively identified the Defendant as her rapist. Ms. Lehtinen again identified him in the courtroom.

---

[1] It is clear from the transcript of the proceedings that this is the same location that Officer Woods and Ms. Lehtinen refer to as the "Rape Crisis Center."

Ms. Lehtinen further testified that she had bruising on her arm that was sustained when the Defendant lifted her from the front seat into the bed inside the cab of the truck and that she did not want to have sex with the Defendant.

On cross-examination, Ms. Lehtinen testified that she was in the truck with the Defendant for "about two and a half, three hours" from the time he picked her up in Union City until he pulled into the shopping center. She later returned to the shopping center with Sergeant Parris. She remembered green lights in the shopping center, but when she returned there, she identified the place because it had green paint. She did not know where the county line was on Highway 51. Ms. Lehtinen explained how she recognized the location of the incident when she returned there with Sergeant Parris, saying that "[i]t looked exactly the same, the buildings, the setup, everything." She confirmed that she was "sure" of the location.

Sergeant Daniel Parris, of the Memphis Police Department's Sex Crime Unit, testified that he was the officer in charge of Ms. Lehtinen's case. Sergeant Parris stated that he met with Ms. Lehtinen "a day or so" after the incident and that she described "some landmarks of where she thought [the rape] had happened." After she gave a statement, Ms. Lehtinen led Sergeant Parris to the location where she was raped. He testified that it was in the parking lot of a Kroger grocery store near the intersection of "Thomas and Whitney," and he confirmed that this shopping center was in Shelby County. He also stated that a Mapco Express gas station in the parking lot had green lights.

The Defendant testified that at the time of the incident he lived in Elgin, Oklahoma and was working as a truck driver for Ryan's Trucking. On the day in question, he was on his way from Union City, Tennessee to Houston, Texas when he met Ms. Lehtinen. After a call came out over his "CB radio" asking whether "somebody was heading towards Memphis that could give somebody a ride," he answered saying that he "had no problem giving them a ride." At that time, he was introduced to Ms. Lehtinen and told that she needed to get to Memphis so that she could then go to Alaska where "a friend had an accident." The Defendant testified that once they began driving toward Memphis, they discussed their lives with each other and conversed about how their jobs were similar.

According to the Defendant, approximately one hour after they set out from Union City, they stopped just south of Dyersburg when Ms. Lehtinen "abruptly asked if [he] wanted oral sex," and he said, "okay." She reached over and started "undoing" his pants and then performed oral sex on him as he drove. The Defendant described the ensuing events as follows:

> A few minutes later I come [sic] to a stop light and she looks up and tells me she wants to have intercourse. So I'm like trying to figure out—I'm looking around trying to figure out a place so I can pull over to stop so I can oblige her.
> I see a place across the street right in front of a McDonald's. So I'm waiting on the light to change so I start shifting gears, but in the meantime, once I see a place to park I tell her to get in the back and get ready and she does.

He said that while she undressed herself, he parked on the shoulder of the road in front of the McDonald's restaurant, and then he undressed and had sex with her in the "sleeper" portion of the cab of the truck. The "incident" took "anywhere from 20 to 35 minutes," and then he realized that he "was falling a little bit behind schedule," so he got dressed and started driving again. He stated that Ms. Lehtinen stayed in bed and that they did not speak again until they arrived at the Memphis city limits about an hour and a half later.

He testified that he did not have a knife in the cab of his truck and that he did not threaten to harm her or strike her. He did not find out there was "a problem" until July 24 or 25 when Sergeant Parris contacted the owner of Ryan's Trucking. He then "went on the internet" and discovered that there was a warrant out for his arrest and later turned himself in to local authorities.

On cross-examination, he denied ever performing oral sex on Ms. Lehtinen despite the fact that the laboratory report from the Tennessee Bureau of Investigation stated that his saliva was recovered from her vagina. He confirmed that he frequently had chance sexual encounters like the one he described and maintained that the sex with Ms. Lehtinen was consensual.

After deliberation, the jury convicted the Defendant of the lesser included offense of rape. This appeal followed.

**Analysis**

I.      **Clerical errors in the judgment**
There are two clerical errors in the Defendant's judgment of conviction. First, the judgment cites the wrong conviction statute: the jury convicted him of violating Tennessee Code Annotated section 39-13-503, the statute defining rape, not section 39-13-502, which defines aggravated rape. Second, the judgment incorrectly states that the Defendant's release eligibility percentage is 30%. By statute, a person convicted of rape "shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained." Tenn. Code Ann. § 40-35-501(h)(2)(i)(1). It is evident from the transcript of the sentencing hearing that the trial court intended to impose a 100% sentence. Accordingly, on remand, the trial court should correct these clerical errors.

II.     **Sufficiency of the evidence to establish venue**
On appeal, the Defendant argues that the evidence was insufficient to establish Shelby County as the proper venue for his trial. Specifically, he asserts that, based on the contradictory testimony presented by Ms. Lehtinen and the Defendant regarding the location of the offense, "no rational trier of fact could have found venue, by a preponderance of the evidence, in this case."

The Tennessee Constitution provides criminal defendants with the right to a jury trial in the county where the offense was committed.[2] State v. Young, 196 S.W.3d 85, 101 (Tenn. 2006). Accordingly, "[a]lthough venue is not an element of the crime, the [S]tate must prove by a preponderance of the evidence that the offense was committed in the county alleged in the indictment." State v. Anderson, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997) (citing Harvey v. State, 376 S.W.2d 497, 498 (Tenn. 1964)) (other citation omitted); see also Tenn. Code Ann. § 39-11-201(e) ("No person may be convicted of an offense unless venue is proven by a preponderance of the evidence."); Tenn. R. Crim. P. 18(a) ("Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed.").

In addition, "venue is a question for the jury," Young, 196 S.W.3d at 101 (citing State v. Hamsley, 672 S.W.2d 437, 439 (Tenn. Crim. App. 1984)), and it can be established by circumstantial evidence. Id. at 101–02 (citing State v. Bennett, 549 S.W.2d 949, 950 (Tenn. 1977)). To determine venue, the jury is permitted to draw reasonable inferences based on the evidence presented. Id. at 102 (citing State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984)). Moreover, "[s]light evidence is enough to carry the prosecution's burden of proof [on venue] if such evidence is uncontradicted." State v. Ellis, 89 S.W.3d 584, 598 (Tenn. Crim. App. 2000) (citing Ellis v. Carlton, 986 S.W.2d 600, 602 (Tenn. Crim. App.1998)) (other citation omitted).

In the present case, we disagree with the Defendant that the evidence was insufficient to establish venue. The victim testified that the rape occurred in a shopping center beside Highway 51 after she and the Defendant had driven for over two and a half hours from Union City and arrived in Memphis.[3] Officer Woods testified that, on the morning of the incident, Ms. Lehtinen informed him that the rape occurred in Memphis. Sergeant Parris testified that he accompanied Ms. Lehtinen to the location of the offense and confirmed that it was in Shelby County. Notwithstanding the Defendant's testimony to the contrary—which the jury did not accredit—we conclude that the cumulative testimony of Ms. Lehtinen, Officer Woods, and Sergeant Parris established venue by a preponderance of the evidence. See Heck Van Tran v. State, No. W2005-01334-CCA-R3-PD, 2006 WL 3327828, at *19 (Tenn. Crim. App., Jackson, Nov. 9, 2006) ("A preponderance of the evidence means evidence which is of greater weight, or is more convincing, than that evidence offered in

---

[2] The constitution states:

> That in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof, to meet the witnesses face to face, to have compulsory process for obtaining witnesses in his favor, and in prosecutions by indictment or presentment, a speedy public trial, by an impartial jury of the county in which the crime shall have been committed, and shall not be compelled to give evidence against himself.

Tenn. Const. art. I, § 9 (emphasis added).

[3] This Court can take judicial notice of the fact that Memphis is in Shelby County. Hopson v. State, 299 S.W.2d 11, 14 (Tenn. 1957) ("The Court can take judicial knowledge of the fact that Memphis is in Shelby County.").

opposition." (citing 32A C.J.S. Evidence § 1312 (2005)), perm. to appeal denied, (Tenn. Apr. 16, 2007); see also State v. Evans, 958 S.W.2d 651, 659 (Tenn. 1997) (holding that a guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory); State v. Bland, 108 S.W.3d 231, 236 (Tenn. 2003) (holding that questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and the appellate court will not re-weigh or re-evaluate the evidence).

### III.    Sentencing

The Defendant also argues that the trial court imposed an improper sentence. Specifically, the Defendant contends that the trial court "did not impose the Defendant's sentence in accordance with the criminal sentencing reform act" because it applied enhancement factors "that were without adequate support in the record" and gave too much weight to those factors. As such, the Defendant asserts that his ten-year sentence was excessive.

#### a.    Standard of review

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that

a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

### b.     Factual findings made and sentence imposed by the trial court

The presentence report reflects that at the time of sentencing the Defendant was thirty-three years old and single. He listed no children or other dependents. He graduated from high school in Colorado and had been employed as a truck driver. In 1997, he was convicted of second degree burglary in Oklahoma, for which he was given a two-year sentence and a $500 fine. The Defendant testified that he was allowed to serve the sentence on probation.

At his sentencing hearing, the Defendant testified that "there's been a grave misunderstanding about the situation" and maintained that he was innocent. He said the victim "turned the tables" on him. He also provided the trial court with documentation that he completed the "Tennessee State University Personal Development and Starting Your Own Business Program," the "Anger Management Program," and the "Alcohol and Drug Program" in the Shelby County Jail.

Following argument by defense counsel, the trial court summarized the purposes of the 1989 Sentencing Reform Act, including the statutory sentencing considerations regarding the propriety of confinement, see Tenn. Code Ann. §§ 40-35-102, -103 (2003),[4] before making a number of factual findings. First, the trial court found that, based on the presentence report, the Defendant would be sentenced as a Range I, standard offender. Consequently, as he stood convicted of a Class B felony, Tenn. Code Ann. § 39-13-503(b) (2003), the trial court could sentence him to "not less than eight (8) nor more than twelve (12) years." Tenn. Code Ann. § 40-35-112(2) (2003).

The trial court then considered whether statutory enhancement factors would be applicable in the Defendant's case. See Tenn. Code Ann. § 40-35-114 (2003). The court found that, based on the prior burglary conviction, he had "a previous history of criminal convictions in addition to those necessary to establish the appropriate range." Tenn. Code Ann. § 40-35-114(2) (2003).

The court also found that "this offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement." Tenn. Code Ann. § 40-35-114(8) (2003). In finding this factor applicable, the court specifically referred to the victim's testimony that the Defendant sucked and licked her breasts and performed oral sex on her prior to engaging in the forced intercourse. The court concluded that those actions were undertaken "in addition to what was necessary for purposes of committing the offense of rape and they would appear to this [c]ourt to be an effort by [the Defendant] to satisfy his own desire for pleasure or excitement . . . ."

---

[4] We note that the legislature has recently amended several provisions of the Criminal Sentencing Reform Act of 1989, said changes becoming effective June 7, 2005. In this case, the Defendant's crime occurred prior to June 7, 2005, and he was sentenced after that date. As such, the Defendant could have elected to be sentenced under the revised Act by executing a waiver of his ex post facto protections, but he did not. See 2005 Tenn. Pub. Acts ch. 353, § 18. Therefore, the 2003 codification of the Act governs. See id.

Regarding enhancement factor (10), that "the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense," Tenn. Code Ann. § 40-35-114(10) (2003), the trial court stated that it was applicable but that it would afford it little weight:

> There was testimony of use of a weapon. I found that that is an enhancement factor. However, the jury returned a verdict of rape and the—I assume, therefore, that they discredited that testimony, although the [c]ourt's not bound by that verdict, I think there was some testimony from the victim that she never saw a weapon. She could only tell that it felt like a knife that was placed to her throat.
> I do find that that's a factor that's present, but I'm not going to put a lot of weight on that factor.

Next, the trial court considered statutory mitigating factors, see Tenn. Code Ann. § 40-35-113 (2003), and did not find any applicable in the Defendant's case. However, the court did find as a mitigating factor that the Defendant had enrolled in and completed several "self-help" programs since being incarcerated in the jail.

The trial court also commented on the circumstances in which the offense was committed and the Defendant's lack of credibility:

> [T]here's never a time when rape is appropriate or good and there's never a time when you could have any justification for it in my mind.
> But under the circumstances of this, when this woman is in probably as low an emotional state as I can imagine, losing a loved one, and then to have this occur, just compounds the problem, and it just shows to me a lack on [the Defendant's] part of any feeling whatsoever.
> Not that there would ever be any in the event somebody commits a rape, but I don't know, it just seems to somehow compound the problem to me, taking advantage of her situation as he did.
> I—I'm sorry that I reject [the Defendant's] explanation that this is just a misunderstanding.
> I don't believe I saw anything in this lady's testimony that would indicate to me she was in any way remotely interested in having sex with [the Defendant] that night under the circumstances of her life.

The trial court further stated that imposing the minimum sentence "would definitely not be a deterrence to others likely to commit this offense or commit similar offenses . . ." and that "the nature of the offense and the manner in which it was committed, as I previously stated, in my mind, psychologically, mentally in the mind of the victim in this case would be great." See Tenn. Code Ann. § 40-35-103(1)(B) (2003) ("Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses.").

Finally, the trial court reiterated that it was placing emphasis on the enhancement factors relating to prior criminal history and the gratification of the Defendant's desire for pleasure or excitement before stating that there was justification for raising the Defendant's sentence above the minimum to eleven years. The trial court then mitigated the sentence to ten years because "he is making some effort, it appears, to help himself while he's incarcerated." The court noted that because the Defendant's sentence was for rape, it was "without parole."

### c.      Propriety of the Defendant's sentence

Our review of the record reflects that the trial court followed the statutory sentencing procedure and imposed a lawful sentence after giving proper consideration and weight to the factors and principles set out under the sentencing law, therefore the presumption of correctness is applicable. See Fletcher, 805 S.W. 2d at 789.

The Defendant concedes that the trial court properly applied the enhancement factor regarding prior criminal history based on his Oklahoma burglary conviction but argues that there was insufficient evidence to support the trial court's application of the enhancement factors relating to pleasure or excitement and employment of a deadly weapon.

We conclude that the evidence was sufficient to support the application of the enhancement factor that "[t]he offense involved a victim and was committed to gratify the [D]efendant's desire for pleasure or excitement." Tenn. Code Ann. § 40-35-114(8) (2003). Our supreme court has explained that to properly apply this enhancement factor in rape cases, it is essential to determine whether a defendant's motive was for sexual fulfillment or sexual pleasure. State v. Arnett, 49 S.W.3d 250, 261–62 (Tenn. 2001) (citing State v. Kissinger, 922 S.W.2d 482, 490 (Tenn. 1996)). The court further explained what kind of proof must be adduced to adequately demonstrate this motive:

> [P]roper application of [this factor] requires the State to provide additional objective evidence of the defendant's motivation to seek pleasure or excitement through sexual assault. Because "pleasure" and "excitement" are affirmative mental states, this requirement is not unduly burdensome, nor does it necessarily require, as the State would argue, "an admission or exclamation of motive by the defendant." Instead, [this enhancement factor] may be applied with evidence including, but not limited to, sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner, or remarks or behavior demonstrating the defendant's enjoyment of the sheer violence of the rape.

Id. at 262 (emphasis added) (citations omitted). The evidence the trial court explicitly relied on in finding this factor applicable—that the Defendant sucked and licked the victim's breast, as well as performed oral sex on her prior to the rape—is sufficient to establish that the Defendant was motivated by a desire for sexual pleasure and excitement.

The Defendant also contends that the evidence was insufficient to establish that the Defendant "possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense." Tenn. Code Ann. § 40-35-114(10) (2003). He asserts that because the jury "discredited the victim's statement about the knife," and because the Defendant testified that he did not employ a knife during the incident or keep one in his truck, "the record clearly does not support the finding that the defendant possessed or employed a deadly weapon during the commission of the offense."

The fact that the Defendant's jury did not convict him of aggravated rape based on the employment of a deadly weapon does not necessarily preclude the sentencing court from enhancing his sentence based on a finding that he used a deadly weapon during the commission of the offense. See State v. Winfield, 23 S.W.3d 279, 282–84 (Tenn. 2000). In a case where whether the defendant used a knife to assault a victim was a disputed fact, and the jury discredited victim testimony regarding the defendant's possession of a knife and convicted on the lesser included offense of assault, the Winfield court held that "a sentencing court may apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted, so long as the facts have been established in the record by a preponderance of the evidence." Id. at 283. Accordingly, it was not erroneous for the trial court to apply the factor in this case. Regardless, the trial court stated that it was not placing "a lot of weight" on this factor.

We conclude that the trial court was warranted in enhancing the Defendant's sentence to the midpoint of the appropriate sentencing range based on the enhancement factors applied. As such, we affirm the sentence imposed by the trial court. The Defendant's arguments are without merit.

**Conclusion**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court and the Defendant's sentence but remand for correction of clerical errors in the judgment of conviction.

_____
DAVID H. WELLES, JUDGE